## GERALD RAINE PLUMBING AND HEATING, INC. *v.* FRIEDMAN ET AL. t/a Bethesda Avenue Associates

[No. 317, September Term, 1968.]

*Decided June 27, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Edward H. Kerman* for appellant.

*Albert E. Brault* for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

Appellant (Raine), a Silver Spring plumbing contractor, replaced the coils, ruptured by freezing, in two (#1 and #2) "air handlers," in a large office building in Bethesda owned and operated by appellees (Friedman). When Friedman refused to pay the bill (stipulated to be $1,646.47) Raine filed suit. From the judgment in favor of Friedman for costs, entered by Loveless, J., sitting without a jury, Raine has appealed. Prior to the incident out of which this dispute arose Raine had done several jobs for Friedman and their relationship had been mutually satisfactory.

In October 1966 Friedman was anxious to increase the flexibility of his heating and cooling system. He telephoned Raine and asked him for an estimate of the cost of installing several gate valves in the pipes which supplied hot and cold water to the system. To accomplish this the entire system had to be drained because of the

necessity of cutting into the main supply and return lines which were located between the first floor ceiling and the underside of the second floor. It was arranged to do this on a weekend when the building would be vacant. Raine told Friedman his men might accomplish it in one day but he "wasn't sure, it was a little hard to figure it out;" he "didn't know how long it would take to drain down * * *." Friedman told him "he would take care of draining the building before * * * [Raine's men] got there." A price was quoted and agreed upon. Saturday, 3 December 1966, was established as the day on which the job was to be undertaken.

At 8 a.m. on the appointed day Willis Washington, Friedman's resident engineer, arrived at the building. He was two hours late, having been directed to report at 6 a.m. He shut down the boiler, opened the drain valves in the basement and the relief valves in the penthouse. It was very cold. Saturday's temperature had averaged 26 degrees; Sunday was even colder. On neither day did the thermometer rise above 32 degrees. Raine's men, led by Hildebrand, the foreman, arrived at 9 a.m. Water was still draining from the system, a process which requires from an hour and a half to two hours. Washington said he "had a few things to do upstairs" so he took Hildebrand to the boiler room and showed him where the water was running out. He said there was nothing Hildebrand had to do to complete the draining of the system except to wait until the water stopped running out. When that happened Hildebrand and his men began the work.

To properly comprehend the crux of this dispute it becomes necessary, at this point, to understand the function and the operation of the two (of five) air handlers that had been placed between the first floor ceiling and the underside of the second floor. Their function, of course, is the exchange of heat. A length of coiled tubing to which fins are attached is arranged within the air handler so that a fan driven by an electric motor blows a stream of air across the tubing. If hot water is running through the tubing the air will be heated. If the

water is cold the air will be chilled. The air which is blown across the tubing comes from two sources; the main source is from the outside through an opening in the building and then by way of ducts to the fan; the other source is the air inside of the building. The mixture is controlled manually; the inside air can be blocked off so that only air from the outside is used. The air handlers were installed so that they were *below* the main supply and return lines to which they were connected. Lest the significance of this fact be overlooked it should be observed that as long as there is positive pressure in the supply line, as is the case in normal operation, the fact that the unit is below the supply and return lines makes no difference; the pressure provides a constant flow through the coiled tubing to the return line. When, however, the pressure in the supply line is equaled by the pressure in the return line, which would be the situation when the system is being drained, there would be no movement of the water in the coiled tubing. In short, the water would be trapped; and it would remain trapped after all of the water had drained out of the system.

There appears to be no dispute about the fact that the fans in all of the air handlers were operating when Washington left the building at 9 a.m. He said he "had no reason to turn them off." It is undisputed also that they continued to operate during the day. When Washington returned to the building at 6 p.m. (Saturday) Hildebrand told him one of the welders had complained about cold air "blowing in on him" and he asked him (Washington) "to cut the fans off." He could have accomplished this by tripping a circuit breaker in the boiler room but Washington did not know about that. He was not familiar with the air handlers as they had been installed at a time when he had been employed elsewhere. Hildebrand helped him remove the ceiling panels beneath each of the five air handlers so as to gain access to the switch which was affixed to each one. In this manner each of the fans was stopped.

The job did not move along as rapidly as Raine hoped

it would. Hildebrand and his men kept going all night and through most of Sunday. When Washington arrived at 7 a.m. on Sunday he found Hildebrand "sitting on a ladder * * * holding a thermometer." It is undisputed that the temperature inside the building did not go much below 40 degrees. Washington said that when the work was completed around 3 p.m. Hildebrand told him he "could fill the system back up and turn the heat on." Not long after the departure of Hildebrand and his men Washington discovered water leaking from #1 air handler. He shut down the water pump and called Raine who dispatched one of his men to the building. After he had plugged up the leak he rigged a by-pass for the air handler. Washington thereupon refilled the system, "cut the heat back on again and by the time he [the workman] left the next one [#2] busted," making it necessary for him "to do the same procedure all over again."

Friedman testified that on Monday, 5 December, he told Raine that he was "in terrible jeopardy * * * and it was absolutely necessary to have everything possible done to replace these coils and put these air handlers back into operation." After Raine had inspected the coils he told Friedman that repair was impossible; the coils would have to be replaced. Price was not discussed. Friedman said he was not "concerned about a price" at that time. Friedman, to expedite matters, guaranteed the payment of the bill for the new coils. Two weeks later, upon the delivery of the coils, Raine did the work and in due course submitted his bill. It ought to be noted that, in the meantime, his bill for the installation of the gate valves (on 3 and 4 December) had been paid, apparently without question.

We think the record makes it quite clear that when Friedman instructed Raine to replace the ruptured coils with new ones, he expected eventual reimbursement from his insurance company (Lumbermens), but we think it is equally clear that Raine did not agree to make his bill subject to such a contingency. Friedman testified "that if the insurance company had paid * * * [him, he] would have

paid Mr. Raine." However, his letter of 14 April 1967 to the insurance adjuster, a copy of which he sent to Raine, casts some doubt on his assertion that the payment of Raine's bill was to be contingent on reimbursement from the insurance company. The text of the letter follows:

"Dear Mr. Green:

"We are enclosing the invoice from Gerald Raine in the amount of $1,646.47 for repairing the two air handling units which froze on the night of December 4, 1966. As discussed with you, this building damage is covered under our Lumbermen's Insurance Policy #60-56193, and payment for this invoice will be forthcoming as soon as it is processed by you and Lumbermen's Insurance Co.

Very truly yours,
BETHESDA AVENUE
ASSOCIATES
/s/ Harry D. Friedman"

Indeed, it seems to us to be somewhat more than likely that Friedman's subsequent disinclination to pay Raine was prompted by Lumbermens. Such an attitude would seem to be consistent with Lumbermens' suit (as subrogee) against Raine to recover for the damage caused by the water which leaked out of the ruptured coils.

The two cases, filed originally in the Circuit Court for Montgomery County but later removed to the Circuit Court for Calvert County, came on for trial before Judge Loveless on 22 October 1968, having been consolidated for that purpose. At the conclusion of the evidence Judge Loveless announced from the bench that Lumbermens was not entitled to recover from Raine. He found "no evidence * * * that Raine * * * had any knowledge of this other system [the air handlers] in the rest of this building." He found also that "the primary obligation * * * to drain" the system rested with Friedman. He commented on Washington's ignorance of the existence of the "drain cocks" on the air handlers. "While Raine may

not have been completely prudent [he continued] in all respects, there was still a certain amount of responsibility, or if you want to refer to it as a type of contributory negligence, that stayed with Friedman." Lumbermens did not appeal.

Judge Loveless also found that Raine was not entitled to recover against Friedman. He seems to have been of the opinion that there was no agreement that Friedman would pay Raine for the work. On 21 November 1968, following a motion filed pursuant to Maryland Rules 18 c and 564 b 2, he filed a written opinion in which he restated his reasons for deciding against Lumbermens. In Raine's case, however, he added something, namely, that he "felt that the Raine Company had been negligent in not recognizing that under the circumstances and situation which existed, the freezing would occur." He said he accepted the testimony of Houghton (called by Friedman as an expert) "that a prudent plumber should have recognized this danger."

We shall set aside the judgment of the lower court because we think, on the evidence in this record, it is clearly erroneous. Rule 886 a. Houghton (the expert) described himself as a mechanical contractor with 27 years of experience in the field of plumbing, heating, air conditioning and specialty piping. He is a licensed plumber; he has a master refrigeration license; he helped set up the code (refrigeration) for the District of Columbia; he actually installed the air handlers in which Raine replaced the ruptured coils. We did not find in his testimony any statement to the effect that "a prudent plumber should have recognized this danger." His own words put it somewhat differently:

"Q. At any rate, it [air handlers] is something that an experienced plumber would know was present in the building?

"A. *An experienced mechanic, not necessarily a plumber.*" (Emphasis added.)

In our judgment there is nothing in this record which

supports a finding of negligence on the part of Raine or his men. Raine was hired to install the gate valves. Friedman delegated to his own resident engineer, Washington, the job of draining the system. Certainly Raine cannot be faulted because he was not sufficiently clairvoyant to suspect that Washington was less than familiar with the equipment in his charge. Friedman argues that Washington's task was to "start the drainage" and that Raine took over the responsibility of completing it when Washington left the building. The evidence seems not to support such a notion. Raine's estimator, Perry, visited the building before the estimate was submitted. While he was there he had a conversation with Friedman and Washington. He said Friedman told him "that the building would be drained down when * * * [Raine's] men got there." Perry, at the time, was unaware of the presence of air handlers above the ceiling. As Washington said, when he left there was nothing more to be done except to wait until the system drained. He left Hildebrand in the boiler room to watch the water run out so that he would know when he could begin his job. There was no reason for Hildebrand to suspect that the system might not be completely empty especially as he had no responsibility in that respect. The evidence reveals Houghton as the only one who knew that the air handlers were *below* the supply and return lines.

Friedman presses the argument that Raine and Hildebrand, knowing how cold it was, should somehow have discovered or suspected that water might be trapped in the coils and that it might freeze. In this regard we think it is highly significant that, although the fresh water system, the wash basin traps, and the toilet tanks and bowls had not been drained, there was no freezing anywhere else in the building despite the fact that it had been without heat for nearly 24 hours. The trapped water in the coils of the other three air handlers did not freeze. We think it is an obvious conclusion that the water in #1 and #2 air handlers froze because the air being blown over the coils, before the fans were turned off, was below

freezing; and the reason it was below freezing was that most of it was being drawn from outside the building. Houghton explained how this was possible. Each unit has a device known as a "freezestat" the purpose of which is to shut off the fan when the temperature of the air reaches a predetermined level. It cannot, however, "keep the normal convection from coming through." Since the temperature in the two air handlers did drop below freezing and since the fans did continue to run, at least until 6 p.m. Saturday, Houghton was of the opinion that the freezestats had been set improperly or else they had broken down. At any rate they failed to do what they were intended to do. It cannot be said with certainty just when the freezing took place. It is possible, however, and perhaps strongly probable, that it took place within minutes after Washington opened the drains, appreciably before Raine's men arrived on the scene. It can hardly be said that Hildebrand was unmindful of the cold weather. The fact that Washington found him sitting on a ladder early Sunday morning with a thermometer in his hand suggests a concern about the temperature inside the building. Since the ambient air was eight degrees above freezing it surely would not have occurred to him that there was any danger of freezing.

We are not impressed with the contention that Friedman neither expressly nor impliedly agreed to pay Raine for the replacement of the damaged coils. They were not strangers dealing at arm's length. Raine had done other work for Friedman. Apparently it had been done satisfactorily; his bills were paid. In this instance Friedman was "in terrible jeopardy" and he pressed Raine "to have everything possible done to replace the coils and put these air handlers back into operation." Raine said he would do it. They did not discuss price. Friedman said he wasn't "concerned about a price." It might be noted parenthetically that the reasonableness of Raine's bill is not disputed and that the job is conceded to have been well done. If at that time Friedman had in mind holding Raine responsible for the freezing of the coils and the damage

to the building it would seem to us most unlikely that he would have paid, without comment, Raine's bill for installing the gate valves. Also it seems unlikely that he would have committed himself to pay for the coils. He expected, to be sure, that Lumbermens would settle with him for the loss occasioned by the freezing. Lumbermens, however, seems to have had a somewhat different notion. As Friedman said, he "was handling this with the insurance adjuster and getting * * * [his] instructions through him." As he put it, he was "involved in a crossfire, as to who was at fault here and who was responsible for it." It was then that he "took the position that * * * [he] would not pay the bill until the insurance company authorized it and told * * * [him] they would pay" him under his insurance coverage. And, of course, counsel for Lumbermens told him not to pay it.

On the evidence in this record we are fully persuaded that Friedman ordered the work, that Raine agreed to do the work and that Friedman impliedly agreed to pay for it and our holding does not require the citation of authorities. As we have indicated we shall reverse the judgment entered by the learned trial judge.

> *Judgment reversed.*
> *Judgment entered in favor of*
> *appellant against appellees*
> *for $1,646.47, with costs.*